# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 6
Petróleos de Venezuela S.A., et al.,
    Appellants,
      v.
MUFG Union Bank, N.A. et al.,
    Respondents.

Igor V. Timofeyev, for appellants.
Jonathan H. Hurwitz, for respondents.
Chamber of Commerce of the United States et al., Bolivarian Republic of Venezuela, George A. Bermann et al., Kermit Roosevelt, III, amici curiae.

TROUTMAN, J.:

In 2016, Venezuela's state-owned oil company offered a bond swap through which its noteholders could exchange unsecured notes due in 2017 for new, secured notes due in 2020. The United States Court of Appeals for the Second Circuit certified three questions

- 1 -

to this Court concerning the extent to which New York law governs this transaction. Upon reformulating the first question, we answer that Venezuelan law governs the validity of the notes under Uniform Commercial Code § 8-110 (a) (1), which encompasses within its scope plaintiffs' arguments concerning whether the issuance of the notes was duly authorized by the Venezuelan National Assembly under the Venezuelan Constitution—i.e., whether there is a defect in the notes occasioned by the application of a constitutional provision bearing on the procedure through which the notes were issued. We emphasize, however, that New York law governs the transaction in all other respects, including the consequences if a security was "issued with a defect going to its validity" (UCC 8-202 [b] [1]-[2]). Given our answer to the first certified question, we need not answer the remaining questions.

I.

Plaintiffs are three related entities. Petróleos de Venezuela, S.A. (PDVSA) is an oil and gas company wholly owned by the Venezuelan government (Venezuelan Const art 303 ["the State shall retain all shares of" PDVSA]). PDVSA Petróleo S.A. (Petróleo) is incorporated in Venezuela and is a wholly owned subsidiary of PDVSA. PDV Holding, Inc. (PDVH), also a wholly owned subsidiary of PDVSA, is incorporated in Delaware and has its principal place of business in Houston, Texas. PDVH wholly owns CITGO Holding, Inc., which is the sole owner of CITGO Petroleum Corporation, a refiner and marketer of petroleum products in the United States. Nonparties CITGO Holding and CITGO Petroleum Corporation are both incorporated in Delaware with a principal place of business in Houston.

II.

As relevant here, Article 150 of the Venezuelan Constitution mandates that "[t]he execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law." It further provides, "No municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly." And section 9 of Article 187 states that "[i]t is the role of the National Assembly to . . . [a]uthorize the National Executive to enter into contracts of national interest, in the cases established by law," and to "[a]uthorize contracts of municipal, state and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela." The Venezuelan Constitution defines neither the term "national public interest contract" nor "contracts of national interest."

III.

In April 2007, PDVSA issued $3 billion of unsecured notes scheduled to come due in April 2017. In October 2010 and January 2011, PDVSA further issued a combined total of $6.15 billion in additional notes scheduled to come due in November 2017. These issuances are collectively referred to as the "2017 Notes." As the maturity date of the 2017 Notes approached, it became clear that, due to declining oil revenues, PDVSA was likely to default on the 2017 Notes.

In May 2016, Venezuelan President Nicolás Maduro declared a "State of Exception and Economic Emergency" granting himself the authority to execute public interest contracts unilaterally. Thirteen days later, Venezuela's unicameral National Assembly passed a resolution reciting that, "[i]n relation to contracts of national . . . public interest concluded by and between the National Executive and . . . companies not domiciled in Venezuela, the Constitution categorically mandates, without exception, the approval of the National Assembly." The resolution further "warn[ed] that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void and shall be considered non-existent," and it "remind[ed] that the contracts of national . . . public interest concluded by and between the National Executive and . . . companies not domiciled in Venezuela, without the approval of the National Assembly . . . , shall be null and void in their entirety."

Nonetheless, in early September 2016, PDVSA's Board of Directors approved the transaction at issue in this case: a bond exchange through which holders of the 2017 Notes could tender them in exchange for new notes with principal due in 2020 (2020 Notes). The parties agree that the transaction was an attempt to avoid default on the 2017 Notes by effectively pushing the maturity date back an additional three years. The 2020 Notes were secured by a pledge, from PDVH, of 50.1% of the equity in CITGO Holding. The pledge was memorialized in a Pledge Agreement naming PDVH as pledgor, PDVSA as issuer, Petróleo as guarantor, defendant GLAS Americas, LLC (GLAS) as collateral agent, and

defendant MUFG Union Bank, N.A. (MUFG) as trustee.[1]   In addition to the Pledge Agreement, the documents governing the exchange offer included the Indenture governing the 2020 Notes and the Global Notes evidencing the obligations of PDVSA and Petróleo to registered holders of the 2020 Notes (collectively, the Governing Documents).[2] PDVSA's sole shareholder, the Venezuelan government, purportedly approved the exchange offer on September 8, 2016, through the President and Director of PDVSA. However, plaintiffs allege that the National Assembly did not authorize the transaction.

The Indenture contains a New York choice-of-law provision nearly identical to those found in the other Governing Documents:

> "This Indenture and the notes shall be construed in accordance with, and this Indenture and the notes and all matters arising out of or relating in any way whatsoever to this Indenture and the notes (whether in contract, tort or otherwise) shall be governed by, the laws of the State of New York without regard to the conflicts of law provisions thereof (other than Section 5-1401 of the New York General Obligations Law)." [3]

---

[1] MUFG is a U.S. banking institution with offices in New York.  GLAS is a limited liability company organized under New York law with offices in New York.

[2] The 2020 Notes were issued through Global Notes registered in the name of Cede & Co. as nominee of the Depository Trust Company representing the total debt issued (*see* 51 F4th 456, 461 n 3 [2d Cir 2022]).

[3] The choice-of-law provision in the Global Notes states as follows:

> "This note shall be construed in accordance with, and this note and all matters arising out of or relating in any way whatsoever to this note (whether in contract, tort or otherwise) shall be governed by, the laws of the State of New York without regard

The exchange offer had a New York nexus.  Plaintiffs used a New York-based financial adviser and an American law firm with New York partners to advise on the structure of the offer.  The Law Debenture Trust Company (DTC) of New York served as the paying agent, transfer agent, and registrar for the Indenture.  Further, the depository for the Indenture is incorporated and headquartered in New York; the 2020 Notes were deposited in New York; the collateral is held in a vault in New York; holders of 2017 Notes who accepted the exchange offer had to tender their notes through DTC in New York; the 2020 Notes were registered through Cede & Co., a general partnership organized under New York law and based in New York; and signature pages executing the Governing Documents were exchanged in New York.

In September 2016, PDVSA announced the exchange offer.  The National Assembly responded by passing a second resolution reciting that the exchange offer required PDVSA to "offer 50.1% of its position in the subsidiary company [CITGO Holding] as collateral," and that "Article 187 of the Constitution empowers the National Assembly to exercise

---

to the conflicts of law provisions thereof (other than Section 5-1401 of the New York General Obligations Law)."

And the Pledge Agreement provides,

"This agreement shall be construed in accordance with, and this agreement and all matters arising out of or relating in any way whatsoever to this agreement (whether in contract, tort or otherwise) shall be governed by, the laws of the State of New York without regard to the conflicts of law provisions thereof (other than Section 5-1401 of the New York General Obligations Law)."

control functions . . . [,] with the power to obtain information about the financial statements and details of any transaction that commits PDVSA's assets as collateral." The resolution resolved to "reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO [Holding] are offered as a guarantee with priority[] or that a guarantee is constituted over any other property of the Nation," and it "urge[d] the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with article[] 187, section 9 . . . of the Constitution."

The exchange offer expired on October 21, 2016. Ultimately, holders of 39.4% of the aggregate principal amount outstanding under the 2017 Notes—representing approximately $2.8 billion—accepted the offer. PDVSA and its subsidiaries then executed the exchange offer, with the 2020 Notes being issued on October 28, 2016, in a principal amount of over $3.3 billion.

Maduro was re-elected President of Venezuela in 2018. In January 2019, the National Assembly declared Maduro's presidency illegitimate and named Juan Guaidó, the president of the National Assembly, as interim President. The following month, the National Assembly passed a law under which Guaidó appointed a competing, ad hoc board of directors for PDVSA.

In October 2019, the National Assembly passed a third resolution specifically addressing the exchange offer. It designated the Indenture a "national public contract" that should have been authorized by the National Assembly under Article 150 of the Constitution and asserted that the transaction was unauthorized.

After making principal and interest payments in 2017 and 2018, and an interest payment in April 2019, PDVSA defaulted by failing to make a scheduled payment in October 2019. At the direction of the ad hoc board of directors, plaintiffs commenced this action seeking a judgment declaring the 2020 Notes and the Governing Documents, "invalid, illegal, null and void *ab initio*, and thus unenforceable." Plaintiffs also sought an order enjoining defendants from enforcing any remedies under the notes. Defendants counterclaimed for a declaration that the 2020 Notes and the Governing Documents are legal and enforceable and that an event of default had occurred, thereby entitling defendant GLAS to sell the collateral. Defendants further asserted counterclaims for breach of contract, unjust enrichment, and quantum meruit.

Following discovery, defendants moved for summary judgment on their breach of contract counterclaim, and plaintiffs moved for summary judgment on all their claims. Plaintiffs argued that the resolutions constituted sovereign acts that rendered the exchange offer void under Venezuelan law and that the court should therefore decline to enforce the 2020 Notes under the act-of-state doctrine. Plaintiffs further argued that the 2020 Notes and the Governing Documents were invalid under Venezuelan law because the exchange offer involved a contract of national public interest requiring approval by the National Assembly pursuant to Article 150 of the Venezuelan Constitution.

The United States District Court for the Southern District of New York (Polk Failla, J.) granted defendants' motion, denied plaintiffs' motion, and declared, among other things, "that the 2020 Notes and the Governing Documents are valid and enforceable; that

a default has occurred under the terms of the Indenture; [and] that Defendants are permitted to exercise the remedies for default set forth in the Indenture and the Pledge Agreement" (495 F Supp 3d 257, 293 [SD NY 2020]). Relevant to the certification here, the court further concluded that New York law, not Venezuelan law, governed the dispute. The court acknowledged that the Governing Documents contained choice of law provisions but proceeded under the assumption that those provisions were not effective, stating that even if those provisions did control it would nonetheless need to assess the applicability of UCC 8-110. The court reasoned that UCC 8-110 (a) (1), which provides that "the validity of a security" is governed by "[t]he local law of the issuer's jurisdiction," did not require the court to apply Venezuelan law because the constitutional provisions at issue here do not speak to "validity" under section 8-110 (*id*. at 284-286 [internal quotation marks omitted]). In the court's view, the term "validity" referred only to whether the securities were "duly authorized" (*id*. at 285-286 [internal quotation marks omitted]).

Based on that assessment, the court concluded that Article 150 of the Venezuelan Constitution did not speak to the authorization of the 2020 Notes because it applied to a "broad category of contracts, and has nothing specifically to do with the issuance of securities" (*id*. at 285-286). "[I]n lieu of any more specific choice of law rule," the court applied the "center of gravity" or "grouping of contacts" analysis to conclude that New York law applies because New York "has the most substantial relationship to the transaction and to the parties" (*id*. at 290 [internal quotation marks omitted]). Plaintiffs appealed.

IV.

The Second Circuit deferred decision because "[t]his case raises important questions about the scope of an as-of-yet uninterpreted provision of the New York Uniform Commercial Code[] and about potential common law exceptions to New York's general approach to enforcing contractual choice-of-law elections" that we have "not addressed" and that "are important to the State's choice-of-law regime and status as a commercial center" (51 F4th 456, 460 [2d Cir 2022]).  Consequently, the court certified the following questions:

> "1.    Given [plaintiffs'] argument that the Governing Documents are invalid and unenforceable for lack of approval by the [Venezuelan] National Assembly, does New York [UCC] 8-110 (a) (1) require that the validity of the Governing Documents be determined under the Law of Venezuela, 'the local law of the issuer's jurisdiction'?
>
> "2.    Does any principle of New York common law require that a New York court apply Venezuelan substantive law rather than New York substantive law in determining the validity of the Governing Documents?
>
> "3.    Are the Governing Documents valid under New York law, notwithstanding [plainitffs'] arguments regarding Venezuelan law?" (*id*. at 475-476).

The Second Circuit explained that they did "not intend to limit the scope" of our analysis by formulating the questions as they did, and they invited us to reformulate the questions as we "deem appropriate" (*id*. at 476 [internal quotation marks omitted]).

Consistent with this invitation, we reformulate the first certified question as follows in order to highlight the limited nature of the "validity" inquiry under UCC 8-110 (a) (1):

1.      Given the presence of New York choice-of-law clauses in the Governing Documents, does UCC 8-110 (a) (1), which provides that the validity of securities is determined by the local law of the issuer's jurisdiction, require the application of Venezuela's law to determine whether the 2020 Notes are invalid due to a defect in the process by which the securities were issued?

We answer this question in the affirmative.  Matters going to the "validity of [the] security" at issue here, that is the 2020 Notes, are governed by the law of Venezuela—i.e., the "the local law of the issuer's jurisdiction" under UCC 8-110 (a) (1).  Plaintiffs' argument that the 2020 Notes are invalid—because their issuance contravened constitutional provisions requiring National Assembly approval to issue the securities— falls within the scope of "validity" as that term is used in UCC 8-110.  Given our answer to this question, we do not reach the second and third certified questions (*see Self-Insurer's Assn. v State Indus. Commn.*, 224 NY 13, 16-17 [1918] [Cardozo, J.]; *see also Cordero v Transamerica Annuity Serv. Corp.*, 39 NY3d 399, 409 [2023], quoting NY Const, art VI, § 3 [b], cl 9; 22 NYCRR 500.27).

V.

The inclusion of a New York choice-of-law clause in a contract demonstrates the parties' intent that "courts not conduct a conflict-of-laws analysis," which thereby "obviates the application of both common-law conflict-of-laws principles and statutory choice-of-law directives," unless the parties or the legislature clearly express a contrary intent (*Ministers & Missionaries Benefit Bd. v Snow*, 26 NY3d 466, 468 [2015]; *see IRB-Brasil Resseguros, S.A. v Inepar Invs.*, S.A., 20 NY3d 310, 312 [2012], *cert denied* 569 US 994 [2013]).  Here, the Governing Documents state that they "shall be governed by[] the

laws of the State of New York without regard to the conflicts of law provisions thereof (other than Section 5-1401 of the New York General Obligations Law)." Because the parties chose New York law, the documents are generally governed by New York's substantive law, except in the narrow category of cases that are subject to the statutory choice-of-law directives set forth in § 5-1401 (1).

One such exception is, even where parties choose New York law, that law "shall not apply . . . to the extent provided to the contrary in subsection (c) of section 1-301 of the uniform commercial code" (*id.*). UCC 1-301 (c) (6) provides in turn that, if UCC 8-110 "specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted."

UCC 8-110 (a) (1) contains the UCC's choice-of-law rules for the validity of securities, providing that "[t]he local law of the issuer's jurisdiction, as specified in subsection (d), governs . . . the validity of a security." Subsection (d), for its part, specifies that the "[i]ssuer's jurisdiction" is "the jurisdiction under which the issuer of the security is organized or, if permitted by the law of that jurisdiction, the law of another jurisdiction specified by the issuer" (UCC 8-110 [d] [internal quotation marks omitted]). Notably, while subsection (d) allows an in-state issuer to "specify the law of another jurisdiction as the law governing" certain matters, it does not allow an in-state issuer to choose another jurisdiction's law to govern the validity of the security (*id.*). And critically for our purposes, out-of-state issuers like PDVSA may select another jurisdiction's law only "if permitted by the law of that jurisdiction" (UCC 8-110 [d]).

The official comments to the UCC further clarify that UCC 8-110 proscribes such a choice because "[t]he question whether an issuer can assert the defense of invalidity may implicate significant policies of the issuer's jurisdiction of incorporation" (UCC 8-110, Comment 2). And, as observed when the legislature adopted revisions to UCC article 8 in the 1990s, "[t]he 'validity of a security, . . . refers to the validity in the sense of corporate or other authority to issue securities, [and] is not included in the list of issues for which the applicable law can be chosen" (Rep of Comm on Uniform State Laws and Banking Law Comm of the Assn of the Bar of the City of NY [Rep of Comms], Feb. 21, 1996 at 22, Bill Jacket, L 1997, ch 566). Moreover, "[t]his lack of choice is consistent with . . . the prevailing view that the law under which an issuer is organized must govern whether a security issued by that entity is valid, in the sense of having been issued pursuant to appropriate corporate or other similar action" (*id*.). Consequently, under UCC 8-110, the issuer of a security must abide by the validity requirements of its own jurisdiction.

The text and history of the provision leave no doubt that this is a mandatory rule. Though General Obligations Law § 5-1401 must be read broadly to promote party choice given that it reflects "the legislature's desire to encourage parties to choose the New York justice system to govern their contractual disputes," (*Ministers*, 26 NY3d at 472; *see IRB-Brasil*, 20 NY3d at 314), the statute states explicitly that it "shall not apply" where 8-110 is applicable (General Obligations Law § 5-1401 [1] [c]; *see* UCC 1-301 [c] [6]). In such a case, "that provision governs" (UCC 1-301 [c]). The legislative history confirms that exempting the validity of a security from New York's otherwise broad endorsement of

party choice was a purposeful decision made to accord with "the prevailing view" and the policy considerations articulated by the authors of the UCC.

Therefore, this is not a case where "engaging in a conflict-of-laws analysis . . . would frustrate the legislature's purpose" (*IRB-Brasil,* 20 NY3d at 316). We reaffirm the principle of *IRB-Brasil* and *Ministers* that when the parties have chosen New York Law, a court may not contravene that choice through a common-law conflicts analysis. In addition, where a statutory provision "is merely a codification of a long-standing common-law conflict-of-laws principle," the same principle applies (*Ministers*, 26 NY3d at 472). Notably, and consistent with the legislative intent of avoiding uncertainty identified in *Ministers* and *IRB-Brasil*, UCC 8-110 does not invite courts to conduct an open-ended conflicts analysis—rather, it clearly identifies "the local law of the issuer's jurisdiction" as the governing law on the validity of a security.

Because UCC 8-110 is applicable here, any issue of the validity of a security issued pursuant to the Governing Documents is determined by the law of the issuer's jurisdiction. In this case, the issuer is a Venezuelan entity, so the law of Venezuela is determinative of the issue of validity.

However, we emphasize that generally, in every other respect, the Governing Documents are governed by New York law. Indeed, it is important to distinguish carefully between the validity of a security issued by a Venezuelan entity, which is governed by Venezuelan law, and all other issues that remain governed by New York Law. Venezuelan law applies here only as to the validity of the securities issued by a Venezuelan entity, not as to other actions arising from or related to the transaction. Even if a security issued by a

Venezuelan entity is invalid under Venezuelan law, the effect of that invalidity is nonetheless governed by New York law (*see* UCC 8-202 [b] [describing remedies available when a security is issued "with a defect going to its validity"]; *cf. Korea Life Ins. Co., Ltd. v Morgan Guar. Tr. Co. of New York*, 269 F Supp 2d 424, 438 [SD NY 2003] ["(T)he existence of illegality is to be determined by the local law of the jurisdiction where the illegal act is done, while the effect of illegality upon the contractual relationship is to be determined by the law of the jurisdiction which is selected under conflicts analysis"]). Furthermore, as discussed below, "validity" under UCC 8-110 is a limited term that bears only on the process by which a security is properly issued.

VI.

This background leads us to the issue of whether the term "validity" as used in UCC 8-110 (a) (1) could apply to Article 150 of the Venezuelan Constitution, such that a court should analyze Article 150 and its related constitutional provisions to determine the validity of securities issued by the Venezuelan entities in this transaction. We conclude that, despite the limited scope of the term "validity" in UCC 8-110, determining whether the securities issued by these Venezuelan entities are valid requires analysis of Article 150 and related provisions of the Venezuelan Constitution, because those provisions may govern the process by which a security is "duly authorized."

When interpreting the UCC, we look to the "language of the statute, as well as the clear commentary on the relevant sections" (*Worthy Lending LLC v New Style Contractors, Inc.*, 39 NY3d 99, 103 [2022]). UCC 8-110 does not define the term "validity," nor do dictionary definitions further our understanding given the specialized nature of the statute

(*see Chauca v Abraham*, 30 NY3d 325, 330-331 [2017] ["(W)ords of technical or special meaning are used by the legislature, not loosely, but with regard for their established legal significance" (internal quotation marks omitted)]).  Therefore, we look to the prevailing understanding of the term "validity" in this specialized area.

In the parlance of commercial and corporate lawyers, "the word 'valid' has a well-developed meaning," which is "that the agreement has been duly authorized by the borrower" (Carl S. Bjerre, *Annual Survey of Commercial Law: Investment Securities*, 76 Bus. Law. 1371, 1375 [Fall 2021] [emphasis added]).  This is consistent with the report contained in the Bill Jacket, which makes clear that UCC 8-110 (a) (1) "refers to validity in the sense of corporate or other authority to issue securities" (Rep of Comms at 22, Bill Jacket, L 1997, ch 566).  For example, a validity determination might involve issues such as whether the proper corporate formalities were observed in issuing the securities and whether the issuer had actual authority to issue those same securities (*see* W. Mark C. Weidemaier & Mitu Gulati, *Unlawfully-Issued Sovereign Debt*, 61 Va J Int'l L 553, 568 [2021]).  The "prevailing view" is that the validity of a security is governed by the law of the jurisdiction where the issuer is organized (Rep of Comms at 22, Bill Jacket, L 1997 ch 566, comm. report at 22; *see e.g.* Am. Bar Assn, *Third-Party Legal Opinion Report, Including the Legal Opinion Accord, of the Section of Business Law, American Bar Association*, 47 Bus. Law. 167, 200 [Nov. 1991] ["(T)he authorization of the Transaction and the Transaction Documents will be governed by the law of the Client's jurisdiction of organization—whether or not it is the law governing the Transaction Document"]).

Legal opinions on validity generally evaluate two issues that speak to whether an agreement was duly authorized: "(1) did the borrower have the power to enter the agreement, and (2) did the proper body or bodies within the borrower approve[] the agreement in the manner required—*with these questions being evaluated both under the borrower's constitutive internal documents, such as its charter, and the external law under which the borrower is organized, such as the jurisdiction's statutes or constitution*" (Bjerre at 1375-1376 [emphasis added]).  Notably, this second consideration includes a procedural determination about whether "all actions or approvals by the [borrower] (e.g., by its board of directors) and its owners (e.g., shareholders or partners) necessary (without resort to principles of estoppel, apparent authority, waiver or the like) to bind the [borrower] under the contract have been taken or obtained and the contract has been duly executed pursuant thereto" (Am. Bar Assn at 200; *see id*. at 201; *see also* Bjerre at 1375 n 19).[4]

Validity should be carefully distinguished from two other issues.  One is the issue of whether the rights and duties created by contractual provisions are contrary to local law, which certain commentaries refer to as "enforceability" (*see* 7 Hawkland § 8-110:2).  In explaining the distinction between validity and enforceability, it is "useful to characterize *validity* requirements as going to the nature of the obligor [e.g., the issuer] and its internal processes on one hand, and on the other hand *enforceability* requirements of general applicability as going to the nature of the rights and obligations purportedly created,

---

[4] While these sources do not define the exact scope of the term "validity," it is clear that validity concerns the antecedent procedures and approvals required for an agreement to be duly authorized.

irrespective of the nature of the obligor and its processes" (Bjerre at 1379 [emphasis added]).  For example, statutory and constitutional provisions of the issuer's jurisdiction may restrict certain interest rates, mandate various contractual provisions, or prohibit fraud.  However, such provisions do not implicate the validity of a security because they do not speak to the "procedural requirement[s]" for it to be duly authorized—i.e., the process without which the security cannot come into being in the first place (*id.* at 1380).  For this reason, a court should not apply such provisions under UCC 8-110 (a) (1).

Second, validity itself should be distinguished from the consequences of validity or invalidity. In broader commercial practice, courts generally "look to the sovereign's law to decide *whether* a loan was validly issued but look to the designated foreign law [i.e., the law specified by contract] to determine the *consequences* of a violation" (Weidemaier & Gulati at 560; *cf.* Restatement [Second] of Conflict of Laws § 202, Comment *c* ["A distinction must here be drawn between the *effect* of illegality upon the validity of the contract and the *existence* of illegality as such" (emphasis added)]).  As to the validity of a security, UCC 8-202 specifically addresses "the circumstances in which an issuer can and cannot assert invalidity as a defense against purchasers" (UCC 8-110, Comment 2).  Even if a court determines that a security is invalid under the local law of the issuer's jurisdiction, the effects of that determination will depend on New York law.

Here, the inquiry is whether the constitutional provisions at issue could render defective the issuer's authority to issue the 2020 Notes or whether they merely implicate the legality of national public interest contracts with foreign entities.  We conclude that Article 150 and its related constitutional provisions could potentially implicate validity

because they speak to whether an entity has the power or authority to issue a security, and relatedly, what *procedures* are required to exercise such authority (*see generally* UCC 8-202, Official Comment 3 [explaining that limitations applicable to governmental issuers are intended to ensure, "as a matter of public policy," that "mere technicalit[ies]" are not grounds for invalidating securities held by an innocent purchaser while also "requiring that the municipality have *power* to issue the security"]).

Article 150 requires "approval of the National Assembly" before certain "national public interest contract[s]" "shall be executed." Section 9 of Article 187 states that "[i]t is the role of the National Assembly to . . . [a]uthorize" such contracts. By their terms, these provisions may address the procedural requirements and approvals necessary for—and present a discrete limitation on—the authority of certain public entities to enter into "national public interest contracts." While defendants analogize Article 150 to a law of general applicability—for example a law prohibiting usurious contracts—this is inapt. Unlike a usury law, which simply prohibits certain terms of interest, Article 150 specifically references the actual authority and process required for due authorization of national public interest contracts, which may include an issuance of securities under Venezuelan Law (*see* brief for *amicus curiae* Kermit Roosevelt III at 5 [characterizing the Venezuelan constitutional provisions as "specific restrictions on the authority of state entities"]).

The official comment to UCC 8-110 reinforces our conclusion that the constitutional provisions at issue here may speak to the validity of the 2020 Notes. That comment ties the meaning of "validity" to the provisions in UCC 8-202, which address "the

circumstances in which an issuer can and cannot assert invalidity as a defense against purchasers" (UCC 8-110, Comment 2; *see* 7 Hawkland § 8-110:2 [explaining that UCC 8-202 is "the principal Article 8 substantive rule to look to for guidance in applying the choice of law rule in subsection 8-110 [a]"]).  For its part, UCC 8-202 (b) provides that "[a] security . . . issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of a *constitutional provision*," in which case "the security is valid in the hands of a purchaser for value and without notice of the defect, other than one who takes by original issue" (UCC 8-202 [b] [1] [emphasis added]).  The same rules apply to "an issuer that is a government or governmental subdivision, agency, or instrumentality," but with additional restrictions (UCC 8-202 [b] [2]).

This discussion of validity, with its reference to constitutional provisions, clarifies that while determining a security's validity generally involves inquiring into whether corporate formalities were observed, it also implicates constitutional provisions of the issuer's jurisdiction that speak to whether a security is duly authorized.  Invalidity under UCC 8-110 (a) (1), when properly understood, does not encompass all defects, and even a defect going to validity may not prevent the terms of the security from being enforced (*see* UCC 8-202, Official Comment 3). However, invalidity under section 8-110 (a) (1) does encompass defects bearing on whether securities were "duly authorized" at the time of their issuance (7 Hawkland at § 8-110:2).  Such defects may exist due to the failure to comply with a specific constitutional provision that applies to the issuance of the security, much in

the same way that a defect may exist due to the failure to comply with corporate formalities governing the issuance of the security.

Indeed, the legislature appears to have understood that the term "validity" in UCC 8-110 is not limited strictly to compliance with corporate formalities. A report "consulted" by the legislature (L 1997, ch 566 § 1) explained that "[t]he 'validity of a security,' . . . in both Prior and Revised Article 8 refers to validity in the sense of corporate *or other authority* to issue securities" and "in the sense of having been issued pursuant to appropriate corporate *or other similar action*" (Rep of Comms at 22, Bill Jacket, L 1997, ch 566 [emphasis added]). Thus, the statutory scheme of the UCC and the language of various pertinent sections of UCC article 8, "as amplified by the Official Comments" (*Banque Worms v BankAmerica Intl.*, 77 NY2d 362, 373 [1991]), support the view that a security's validity, at the time it is issued, may be determined by reference to a qualifying constitutional provision.

Defendants minimize "section 8-202 (b) (1)'s reference to 'violation[s] of … constitutional provision[s]' " by claiming that it "is cabined to those constitutional provisions directly dealing with the issuance of securities" (51 F4th at 469). But this limitation is nowhere in the text of section 8-110, section 8-202, or the official comments. Moreover, it is not clear what "directly deal with the issuance of securities" would mean in this context. The parties here agree that general requirements of corporate law governing approval of transactions affect the validity of a security, even though they may apply generally to all transactions, rather than solely to securities. The proper line, therefore, must be drawn between constitutional provisions that determine the validity of a security

and those that determine other issues, not between those that speak to securities by name and those that do not. Because the constitutional provisions here may affect validity in the sense that they render defective the issuer's procedural authority to issue the securities in question, they are relevant to the analysis under UCC 8-110.

VII.

This litigation has focused heavily on whether certain provisions of the Venezuelan Constitution are relevant to the validity of securities issued by certain Venezuelan entities under the Governing Documents. We conclude that they are. However, in light of New York's "status as a commercial center" (51 F4th at 460) and our previous decisions demonstrating respect for New York choice-of-law agreements (*see e.g. Ministers*, 26 NY3d at 468), the application of Venezuelan law to the Governing Documents must be narrowly confined. The exception provided by UCC 8-110 provides no opportunity for the application of foreign laws going to the enforceability of a security, nor does it affect the adjudication of any question under the contract other than whether a security issued by a foreign entity is valid when issued.

None of this is to say that plaintiffs will ultimately be victorious. The question that we have answered is merely whether UCC 8-110 (a) (1) requires courts to consider if the 2020 Notes were issued with defects going to their validity under Article 150 and other related provisions of Venezuela's Constitution. The question remains whether, under those constitutional provisions, failure to receive authorization from the National Assembly prior to issuing the 2020 Notes means that the notes were invalid under the law of Venezuela at the time of their issuance. That, however, is an issue that we must leave for the federal

courts to determine.  Finally, even if it is determined that the securities were "issued with a defect going to [their] validity" under Venezuelan law, New York law nonetheless governs the consequences of that defect (*see* UCC 8-202 [b]).

Accordingly, the first certified question, as reformulated, should be answered in accordance with this opinion and the remaining questions not answered.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, first certified question, as reformulated, answered in accordance with the opinion herein and remaining questions not answered. Opinion by Judge Troutman. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Curran concur. Judge Halligan took no part.

Decided February 20, 2024